**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

| | |
|---|---|
| MICHAEL PETERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TOTAL SYSTEM SERVICES, INC., M. TROY WOODS, KRISS CLONINGER III, DR. SIDNEY E. HARRIS, RICHARD W. USSERY, PHILIP W. TOMLINSON, MASON H. LAMPTON, JOHN T. TURNER, WILLIAM M. ISAAC, RICHARD A. SMITH, CONNIE D. MCDANIEL, WALTER W. DRIVER JR., F. THADDEUS ARROYO, and JOIA M. JOHNSON,<br><br>Defendants. | Case No.   4:19-cv-00114<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michael Peters ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Total System Services, Inc. ("TSS" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with TSS, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between TSS and Global Payments Inc. ("Global Payments").

2.      On May 27, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 0.8101 shares of Global Payments stock for each share of TSS they own (the "Merger Consideration").

3.      On July 3, 2019, in order to convince TSS shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading S-4 violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that TSS shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by TSS's financial advisors, Greenhill & Co., LLC ("Greenhill") and Goldman Sachs & Co. LLC ("Goldman Sachs") in support of their opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to TSS shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because TSS is incorporated in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of TSS common stock.

12.     Defendant TSS is incorporated in Georgia and maintains its principal executive offices at One TSYS Way, Columbus, GA 31901. The Company's common stock trades on the NYSE under the ticker symbol "TSS."

13.     Individual Defendant M. Troy Woods is TSS's President, Chief Executive Officer, and Chairman and has been a director of TSS since January 2003.

14.     Individual Defendant Kriss Cloninger III is TSS's Lead Director and has been a director of TSS since July 2004.

15.     Individual Defendant Dr. Sidney E. Harris has been a director of TSS since December 1999.

16.     Individual Defendant Richard W. Ussery has been a director of TSS since January 1982.

17.     Individual Defendant Philip W. Tomlinson has been a director of TSS since January 1982.

18.     Individual Defendant Mason H. Lampton has been a director of TSS since January 1986.

19.     Individual Defendant John T. Turner has been a director of TSS since October 2003.

20.     Individual Defendant William M. Isaac has been a director of TSS since January 2014.

21.     Individual Defendant Richard A. Smith has been a director of TSS since October 2017.

22.     Individual Defendant Connie D. McDaniel has been a director of TSS since January 2014.

23.     Individual Defendant Walter W. Driver Jr. has been a director of TSS since July 2002.

24.     Individual Defendant F. Thaddeus Arroyo has been a director of TSS since October 2017.

25.     Individual Defendant Joia M. Johnson has been a director of TSS since October 2018.

26.     The Individual Defendants referred to in paragraphs 13-25 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of TSS (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

28.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of June 28, 2019, there were approximately 181,000,000 shares of TSS common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of TSS will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

      i)      whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

      ii)      whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

      iii)      whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

      iv)      whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.  A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    The Proposed Transaction

29.  TSS is a global payment solution provider that provides payment processing services, merchant services and related payment services to financial and nonfinancial institutions. Additionally, the Company provides general purpose reloadable prepaid debit and payroll cards, demand deposit accounts and other financial service solutions. The Company operates in three segments: Issuer Solutions, Merchant Solutions, and Consumer Solutions.

30.  On May 28, 2019, TSS and Global Payments issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> ATLANTA & COLUMBUS, Ga.--(BUSINESS WIRE)--Global Payments (NYSE:GPN), a leading worldwide provider of payment technology and software solutions, and TSYS (NYSE:TSS), a leading global payments provider offering innovative solutions across the issuing, merchant and consumer segments, announced today that they have entered into a definitive agreement to combine in an all-stock merger of equals.
>
> The transaction creates the premier payments technology company at scale in the largest and most attractive financial technology markets worldwide. Combined, Global Payments and TSYS will provide cutting edge payments and software solutions to approximately 3.5 million predominantly small to mid-sized (SMB) merchant locations and more than 1,300 financial institutions across more than 100 countries. TSYS will also substantially expand Global Payments' ecommerce and omnichannel solutions presence in the United States and provide further opportunities for meaningful multinational omnichannel market share gains. Finally, Global Payments will have exposure to some of the fastest growing digital payments trends through TSYS' issuer and consumer solutions businesses.
>
> "The combination of Global Payments and TSYS establishes the leading pure

play payments technology company with unparalleled vertical market and payment software capabilities and ecommerce and omnichannel solutions, operating at scale in fast growing markets globally," said Jeff Sloan, Chief Executive Officer of Global Payments. "This transformative partnership accelerates our technology-enabled, software-driven payments strategy and provides exposure into attractive and complementary businesses, while enhancing our financial strength and flexibility." Sloan continued, "We could not be more excited about the future as we bring together two industry leaders with strong businesses and cultures that will generate significant opportunities for our employees, customers, partners and shareholders worldwide."

"In this exciting merger of equals, our new company will truly be a payments powerhouse that is perfectly poised to lead the industry in delivering merchant, issuer and consumer payments technology, solutions and service to our customers," said M. Troy Woods, Chairman, President and Chief Executive Officer of TSYS. "Our companies share common values, a strong culture of putting people first, and a relentless commitment to doing the right thing, making this combination the perfect fit. The entire TSYS team is proud to link arms with Global Payments, and we look forward to leading the market as the preeminent payment solutions provider."

William I Jacobs, Chairman of Global Payments, said "It has been my honor to serve as Lead Director and then Chairman of Global Payments since its IPO in 2001. I am delighted with the agreed partnership with TSYS, which I believe combines the two best payments technology companies worldwide. Their future is very bright, and I look forward to continuing to contribute to their board."

The combined company is expected to have investment grade credit ratings immediately on closing based on its strong financial profile and free cash flow generation. Global Payments will maintain a disciplined, long-term focused capital allocation strategy that balances re-investment in the business and returns to shareholders, while maintaining an investment grade balance sheet and ensuring ample liquidity and financial flexibility.

**Compelling Strategic Rationale and Financial Benefits**

<u>Diversified Payments Technology Company at Scale</u>: The combination creates a leading provider of distinctive technology-enabled payments solutions and services with significant exposure to the most attractive vertical markets and fastest growth geographies. Upon closing, Global Payments will process in excess of 50 billion transactions annually in 38 countries physically and over 100 countries virtually, and serve nearly 3.5 million predominantly SMB merchant locations globally, with an unmatched salesforce of over 3,500 sales and sales support professionals worldwide.

<u>Targeting the Most Attractive End Markets in Payments</u>: Global Payments and

TSYS will have a leading position in integrated payments as TSYS' exposure to 50 plus vertical markets are highly complementary with OpenEdge's presence in 70 plus vertical markets today. TSYS' ecommerce and omnichannel business in the United States will substantially enhance Global Payments' existing domestic business and provide numerous additional multinational opportunities for cross-sell internationally. The combined company will also benefit from TSYS' payment facilitation technologies. In addition, Global Payments' extensive acquiring operations in 31 countries outside the United States will enable significant cross-sell opportunities for TSYS' issuer solutions business internationally, providing additional access to faster growth markets. Finally, TSYS' consumer and issuer solutions businesses provide exposure to developing business-to-business as well as person-to-person digital payment trends, two segments in which Global Payments does not currently compete, providing a new avenue for growth.

Extending Leadership in Software: The combination of Global Payments and TSYS will create one of the largest software companies in the United States with an emphasis on payments. Over 6,000 of the company's employees will be dedicated to developing market leading technologies. Global Payments expects to accelerate TSYS' modernization efforts and legacy of innovation in card issuing, as TSYS continues to focus on a product driven strategy as it moves increasingly towards more cloud-based functionality.

Combining Similar Cultures: Global Payments and TSYS are very proud of their strong, complementary corporate cultures developed over many years. For each company, our colleagues come first, and our employees are the most important contributors to our success. We will take the best of both of our cultures going forward and preserve and enhance our commitments to the communities in which we live and work. On a combined basis, the company will invest significantly in training and development to provide further opportunities for current and future colleagues.

Enhanced Financial Profile and Flexibility: The combined company is expected to generate approximately $8.6 billion in annual adjusted net revenue plus network fees[2] and approximately $3.5 billion in adjusted EBITDA on a pro forma basis for 2019, inclusive of run-rate revenue and expense synergies.
The pro forma financial profile, including industry leading organic growth and strong free cash flow generation, will provide flexibility to invest in innovation, pursue strategic acquisitions, and return capital to shareholders. Global Payments will be well capitalized with a pro forma leverage ratio of approximately 2.5x at close and is committed to maintaining leverage at this level to support its expected investment grade credit ratings going forward. In addition, the combined company intends to preserve the existing TSYS dividend yield.

Significant Value Creation for Shareholders: The transaction is expected to be mid-single digits accretive to adjusted earnings per share in 2020 and low double

digits accretive thereafter on an operating basis. The combination is expected to deliver at least $300 million of annual run-rate cost synergies primarily through combining business operations, aligning go-to-market strategies, streamlining technology infrastructure, eliminating duplicative corporate and operational structures, and scale efficiencies. Additionally, annual run-rate revenue synergies are expected to be at least $100 million, primarily from significant opportunities to cross-sell complementary technology solutions through the combined direct distribution network. These synergies are expected to be realized within three years.

**Transaction Details**

Under the terms of the merger agreement, TSYS shareholders will receive 0.8101 Global Payments shares for each share of TSYS common stock, representing an equity value for TSYS of approximately $21.5 billion. This reflects a price per share of $119.86 for each share of TSYS common stock, and an approximately 20% premium to TSYS' unaffected common share price as of the close of business on May 23, 2019.

Upon closing, Global Payments shareholders will own 52% of the combined company, and TSYS shareholders will own 48% on a fully diluted basis. The merger agreement has been unanimously approved by each company's Board of Directors.

**Governance and Leadership**

Upon closing, the Board of Directors of the combined company will consist of 12 members, 6 of whom will be from the Board of Directors of Global Payments and 6 of whom will be from the Board of Directors of TSYS. Troy Woods will become Chairman of the Board of Directors and Jeff Sloan will serve as Chief Executive Officer of the combined company and a Board member. Cameron Bready will become President and Chief Operating Officer of the combined company and Paul Todd will become Chief Financial Officer.

The executive leadership team will be comprised equally of individuals from Global Payments and TSYS with a demonstrated track record of leadership and innovation in payments and significant expertise in driving value creation.

The combined company will be named Global Payments and will have dual headquarters in Atlanta and Columbus, Georgia. Global Payments will conduct its issuer solutions business under the TSYS name, and NetSpend will continue to be the go-to-market name for the consumer solutions business.

**Timing and Approvals**

The transaction, which is expected to close in the fourth quarter of 2019, is

subject to the receipt of required regulatory approvals and other customary closing conditions and the approval of shareholders of both companies. The transaction is not subject to any financing conditions.

**Advisors**

BofA Merrill Lynch and J.P. Morgan Securities LLC are serving as financial advisors to Global Payments and have provided committed financing. Wachtell, Lipton, Rosen & Katz is serving as legal advisor to Global Payments.

Goldman, Sachs & Co. LLC and Greenhill & Co. are serving as financial advisors to TSYS. King & Spalding LLP is serving as legal advisor to TSYS.

31.     TSS is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

32.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

**II.     The Materially Incomplete and Misleading S-4**

33.     On July 3, 2019, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits

material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### The Materially Misleading Sales Process

34.    The S-4 fails to disclose certain information which is necessary for shareholders to be certain that the Proposed Transaction is the product of a fair sales process. This information is material because whether or not a sales process is fair directly relates to the adequacy of the consideration.

35.    The *Background of the Merger* fails to disclose whether the Company sought other suitors. Additionally, if the Company did not seek other bidders, the S-4 fails to disclose why the Company did not. The Company's reasons for deciding not to engage in a competitive bidding process are material in light of the fact that the Company has agreed to preclusive deal mechanics that limit the possibility any other company would make a bid for TSS. The S-4 acknowledges that a potential risk and negative factor against the signing of the Merger Agreement was "the fact that certain provisions of the merger agreement, although reciprocal, may have the effect of discouraging proposals for alternative acquisition transactions involving TSYS, including: (i) the restriction on TSYS' ability to solicit proposals for alternative transactions; (ii) the requirement that the TSYS board of directors submit the merger agreement to the TSYS shareholders for approval in certain circumstances, even if it withdraws its recommendation for the merger; and (iii) the requirement that TSYS pay a termination fee of $860 million to Global Payments in certain circumstances following the termination of the merger agreement[.]" S-4 98.

36.    The requirement for the Board to submit the Merger Agreement even if the Board withdraws its recommendation is particularly discouraging to potential new bidders because no

reasonable company would want to expand the resources for due diligence and negotiation only to have a competing, lesser proposal still be voted on. Therefore, shareholders need to know what kind of effort, if any, the Company made to solicit bids prior to signing the Merger Agreement, as it is very unlikely a new bidder will come. Without this knowledge, shareholders cannot be sure that the Merger Consideration represents the true value of their shares.

37.    Therefore, in order for shareholders to have the necessary understanding of the sales process, the Company must disclose whether or not any efforts were made to contact other bidders and conduct a competitive bidding process and, if not, why. Without this material information, shareholders are unable to determine the fairness of the sales process and therefore are unable to determine if the Merger Consideration is truly fair.

### The Materiality of Financial Projections

38.    A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses "Global Payments senior management and TSYS senior management prepared or approved for use certain unaudited prospective financial information which was provided to and considered by each of BofA Merrill Lynch and J.P. Morgan, at the direction of Global Payments management, and Greenhill and Goldman Sachs, at the direction of TSYS management, in each case for the purpose of performing financial analyses in connection with their respective fairness opinions . . . and was provided to each of TSYS and Global Payments, respectively, and their respective boards of directors."  S-4 122.

39.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers

and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

40.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

41.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

42.     Here, TSS's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts when voting to approve the Merger Agreement. S-4 95-97.

43.     As discussed further below, the non-GAAP financial projections here do not provide TSS's shareholders with a materially complete understanding of the assumptions and key factors considered in developing financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

44.     The S-4 discloses that "Global Payments senior management and TSYS senior management prepared or approved for use certain unaudited prospective financial information which was provided to and considered by each of BofA Merrill Lynch and J.P. Morgan, at the direction of Global Payments management, and Greenhill and Goldman Sachs, at the direction of TSYS management, in each case for the purpose of performing financial analyses in connection with their respective fairness opinions . . . and was provided to each of TSYS and Global Payments, respectively, and their respective boards of directors." *Id.* at 122.

45.     The S-4 further discloses that the assumptions used in the financial projections were, "in the view of the Global Payments senior management team and the TSYS senior management team . . . prepared on a reasonable basis . . . ." *Id.*

46.     The S-4 goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2024 for: (1) Net Revenue; (2) Adjusted EBITDA; (3) Adjusted Operating Income; and (4) Adjusted Earnings Per

Share but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 124.

47.    The S-4 defines Net Revenue as "total revenue less reimbursable items[.]" *Id.* at 124 n.1. Nevertheless, the S-4 fails to disclose the line items used to calculate Net Revenue, rendering the S-4 materially false and/or misleading. *Id.*

48.    The S-4 defines Adjusted EBITDA as "net income excluding equity in income of equity investments, interest expense (net of interest income), income taxes, depreciation, amortization, client incentive/contract asset amortization, contract cost asset amortization, gains or losses on foreign currency translations, other non-operating income or expenses, share-based compensation expenses, litigation, claims, judgments or settlements and certain merger and acquisition expenses[.]" *Id.* Nevertheless, the S-4 fails to disclose the line items used to calculate Adjusted EBITDA, rendering the S-4 materially false and/or misleading. *Id.*

49.    The S-4 defines Adjusted Operating Income as "operating income . . . excluding acquisition-related intangible amortization expense, share-based compensation expense and one-time charges[.]" *Id.* Nevertheless, the S-4 fails to disclose the line items used to calculate Adjusted Operating Income, rendering the S-4 materially false and/or misleading. *Id.*

50.    The S-4 defines Adjusted Earnings Per Share as "earnings per share . . . excluding acquisition-related intangible amortization expense, share-based compensation expense [] one-time charges and . . . the related income tax effects associated with such adjustments." *Id.* Nevertheless, the S-4 fails to disclose the line items used to calculate Adjusted Earnings Per Share, rendering the S-4 materially false and/or misleading. *Id.*

51.     Thus, the S-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

52.     The financial projections disclosed on page 124 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading, as shareholders are unable to discern the veracity of the financial projections.

53.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisor.

### The Financial Projections Violate Regulation G

54.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).
[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

measures."[3]

55.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

56.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as TSS included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-

---

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

57.    The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

---

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.    The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions and reflects the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from

58.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

59.    In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies. Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above.

60.    Additionally, the Company has clearly forecasted the GAAP compliant measures. Adjusted EBITDA is defined as "*net income* excluding [other items] . . . ." S-4 124. (emphasis added). The Company would therefore be unable to forecast Adjusted EBITDA in any intelligible way *unless* net income, the gold standard of GAAP compliant terms, was forecasted. Therefore, since the Company has acknowledged net income has already been forecasted, there was no reason for the Company to not provide the net income projections.

61.    As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

---

Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

62.    In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 124, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

63.    The summary of the valuation methodologies utilized by Greenhill and Goldman Sachs, including the utilization of certain of the non-GAAP financial projections described above by Greenhill and Goldman Sachs, in connection with their valuation analyses, (*id.* at 100, 112) is misleading in violation of Regulation 14a-9.    The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once an S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

64.    With respect to Greenhill's *Total TSYS Implied EV* analysis, the S-4 fails to disclose TSS's cash balance and equity investments and debt as of April 30, 2019, and the number of fully diluted shares of TSS common stock outstanding as of May 23, 2019.

65.    With respect to Greenhill's *Historical Average Acquisition Premia Analysis*, the S-4 fails to disclose the individual transactions and individual premia Greenhill observed, or at the very least the summary statistics of the premia observed.

66.    With respect to Greenhill's *Analyst Price Targets Analysis*, the S-4 fails to disclose fails to disclose the individual price targets and identify the sources thereof.

67.    With respect to Greenhill's prior relationships with TSS, the S-4 fails to disclose the timing and the nature of the services provided in relation to the $4.5 million dollars Greenhill has received from TSS.

68.    With respect to Goldman Sachs's *Implied Premia and Multiple Analysis*, the S-4 fails to disclose TSS's net debt and Global Payments net debt and non-controlling interests.

69.    With respect to Goldman Sachs's *Illustrative Present Value of Future Stock Price Analysis for TSYS*, Goldman Sachs applied illustrative one year forward price to adjusted EPS multiples of 18.0x to 20.0x to estimates of the adjusted EPS of TSS for 2019 through 2021. *Id.* at 116. Goldman Sachs applied a 7.5% discount rate, reflecting TSS's cost of equity, to each year to estimate the present value as of May 23, 2019. *Id.*

70.    The S-4 fails to disclose the inputs and assumptions underlying the selection of one year forward price to adjusted EPS multiples of 18.0x to 20.0x and the inputs and assumptions underlying the selection of a 7.5% cost of equity.

71.    With respect to Goldman Sachs's *Illustrative Present Value of Future Stock Price Analysis for TSYS Shares on a Pro-Forma Basis*, Goldman Sachs applied illustrative one year forward price to adjusted EPS multiples of 19.0x to 21.0x to estimates of the adjusted EPS of Global Payments on a pro-forma basis for 2019 through 2021, taking into account the synergies expected to be generated. *Id.* at 119. Goldman Sachs applied an 8.5% discount rate, reflecting Global Payments' cost of equity on a pro-forma basis, to each year to estimate the present value as of May 23, 2019. *Id.* Goldman Sachs also discounted the estimated dividends to be paid per share of Global Payments common stock at the end of each applicable year. *Id.*

72.    The S-4 fails to disclose the inputs and assumptions underlying the selection of one year forward price to adjusted EPS multiples of 19.0x to 21.0x, the inputs and assumptions underlying the selection of an 8.5% cost of equity, and the value of the dividends to be paid.

73.    With respect to Goldman Sachs's Premia Paid Analysis, Goldman Sachs reviewed and analyzed the premia paid in 110 acquisitions of publicly traded companies in the United States

announced from January 1, 2014 through May 23, 2019 with a transaction value of $5 billion or greater. Id. at 117. However, the S-4 fails to identify the individual transactions, identify the premia for each transaction, and identify which transactions have actually closed.

74.    Greenhill and Goldman Sachs both performed discounted cash flow analyses on the Company and Global Payments. Goldman Sachs also performed a discounted cash flow analysis on the pro-forma company. With respect to Greenhill's *Discounted Cash Flow Analysis*, the S-4 states that Greenhill calculated the unlevered free cash flow ("UFCF") that the Company was expected to generate for the years ending December 31, 2019 through December 31, 2024, and that Global Payments was projected to generate during the years ending December 31, 2019 through December 31, 2023. *Id.* at 101-102. Greenhill also calculated a range of terminal values for both companies by applying a perpetuity growth rate ranging from 2.0% to 3.0% to the calculated UFCF. *Id.* At 102. Greenhill used a discount rate of 6.62% to 7.62% for TSS and 6.48% to 7.48% for Global Payments, based on TSS's and Global Payments' respective estimated weighted average cost of capital. *Id.* Greenhill calculated each company's weighted average cost of capital by using the cost of equity derived from the capital asset pricing model and the estimated after-tax cost of debt. *Id.* Greenhill then subtracted the companies' net debt as of April 30, 2019 to the calculated values. *Id.*

75.    The S-4 does not disclose what the calculated UFCF values for either company were, or even how Greenhill calculated UFCF. Additionally, the S-4 fails to disclose the calculated range of terminal values for either company, any of the inputs that went into calculating either company's weighted average cost of capital, the inputs and assumptions that went into the selection of the perpetuity growth rate range of 2.0% to 3% used for both companies, how stock-based compensation was treated, and the fully diluted shares for both companies.

76.    With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis for TSYS*, Goldman Sachs discounted the UFCF the Company is expected to generate for the period from March 31, 2019 through December 31, 2024 as reflected in the TSS forecasts and a range of terminal values that were calculated by applying a perpetuity growth rate ranging from 2.0% to 2.5% to the terminal year UFCF for the Company. *Id.* at 115. Goldman Sachs used a discount rate range of 6.5% to 7.5%, calculated as an estimate of the Company's weighted average cost of capital using the capital asset pricing model, which requires certain company-specific inputs, including the company's target capital structure weightings, the cost of long-term debt, future applicable marginal cash tax rate and a beta for the company. *Id.* at 115-116. Goldman Sachs then subtracted the Company's net debt and divided the range of illustrative equity values by the fully diluted shares of TSS common stock outstanding as of May 23, 2019.  *Id.*

77.    With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis for Global Payments*, Goldman Sachs discounted the UFCF Global Payments is expected to generate for the period from March 31, 2019 through December 31, 2024 as reflected in the Global Payments forecasts without taking into account the forecasted synergies and a range of terminal values that were calculated by applying a perpetuity growth rate ranging from 2.5% to 3.0% to the terminal year UFCF for Global Payments. *Id.* at 118. Goldman Sachs used a discount rate range of 7.5% to 8.5%, calculated as an estimate of Global Payments' weighted average cost of capital using the capital asset pricing model, which requires certain company-specific inputs, including Global Payments' target capital structure weightings, the cost of long-term debt, future applicable marginal cash tax rate and a beta for the company. *Id.* Goldman Sachs then subtracted Global Payment' net debt and noncontrolling interests of Global Payments and divided the range of

illustrative equity values by the fully diluted shares of Global Payments common stock outstanding as of May 23, 2019. *Id.*

78.    With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis for TSYS Shares on a Pro-Forma Basis*, Goldman Sachs discounted the UFCF Global Payments is expected to generate for the period from March 31, 2019 through December 31, 2024 as reflected in the Global Payments forecasts and a range of terminal values that were calculated by applying a perpetuity growth rate ranging from 2.25% to 2.75% to the terminal year UFCF for Global Payments, taking into account the forecasted synergies. *Id.* Goldman Sachs used a discount rate range of 7.0% to 8.0%, calculated as an estimate of Global Payments' pro-forma weighted average cost of capital using the capital asset pricing model, which requires certain company-specific inputs, including Global Payments' target capital structure weightings, the cost of long-term debt, future applicable marginal cash tax rate and a beta for the company. *Id.* at 118-119. Goldman Sachs then subtracted Global Payments' net debt and noncontrolling interests of Global Payments on a pro-forma basis (reflective of transaction financing considerations as provided by TSS management), and divided the range of illustrative equity values by the fully diluted shares of Global Payments common stock outstanding as of May 23, 2019 plus the amount of shares expected to be issued in the merger. *Id.* at 119.

79.    For all three analyses, the S-4 is unclear if Goldman Sachs calculated the companies' UFCF or if the UFCF was given by each companies' management. Regardless of whether or not Goldman Sachs calculated the UFCF values, neither the values nor the definition is disclosed. Additionally, the S-4 does not disclose the calculated range of terminal values for any of the analyses, any of the inputs that went into calculating either company's weighted average cost of capital, the inputs and assumptions that went into the selection of the perpetuity growth

rate range used in each analysis, how stock-based compensation was treated, the net debt or the fully diluted shares of either company, and Global Payments' non-controlling interests.

80.    Since information was omitted, shareholders are unable to discern the veracity of both Greenhill's and Goldman Sachs' Discounted Cash Flow Analyses. Without further disclosure, shareholders are unable to compare both Greenhill's and Goldman Sachs' calculations with the Company's financial projections.  The absence of any single piece of the above information renders both Greenhill's and Goldman Sachs's Discounted Cash Flow Analyses incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

81.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . "  *Id.* (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

82.    Moreover, neither Greenhill or Goldman Sachs' analyses disclose the forecasted UFCF values or even the method to calculate them. Shareholders need this information to read Greenhill's and Goldman Sachs' analyses together. Without knowledge of the UFCF numbers and definition, it is unclear that Greenhill and Goldman Sachs even used the same formulas. Indeed,

since UFCF is a non-GAAP financial there is no requirement to calculate UFCF in a consistent manner. Additionally, it is not clear that when calculating UFCF Greenhill and Goldman Sachs treated stock-based compensation the same, as neither financial advisor mentions if stock-based compensation was treated as a cash-based expense or not.

83.    Global Payments' UFCF is just as important for TSS shareholders as TSS's UFCF projections. Since the Merger Compensation is comprised of Global Payments' stock, it is necessary for TSS shareholders to know and understand Global Payments' UFCF projections so TSS shareholders can understand the true value of the compensation they stand to receive.

84.    Therefore, in order for TSS shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

85.    In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from TSS shareholders.

86.    Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

87.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

88.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

89.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any S-4 or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

90.     As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

91.    The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

92.    As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

93.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

94.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

95.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

96.    Defendants have issued the S-4 with the intention of soliciting shareholder support

for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

97.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

98.    The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

99.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

100.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately

involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

101.    TSS is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

102.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

103.    As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

104.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

105.    The Individual Defendants acted as controlling persons of TSS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of TSS, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or

indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

106.    Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

107.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.    The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.    They were thus directly involved in preparing the S-4.

108.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.    The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.    The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

109.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

110.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.    By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.    As a direct and proximate

result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  July 18, 2019

Respectfully submitted,

*/s/ James M. Wilson, Jr.*
James M. Wilson, Jr.
Ga. Bar No. 768445
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331

Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Michael Peters ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Total System Services Inc. ("Total System") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Total System securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 15th day of July, 2019.

_Michael Peters_
Michael Peters

| Transaction<br>(Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 09/19/16 | 200 |
| | | |
| | | |